486.24938 22/06

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ADAM McCURDY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No.: 14 CV 003645 |
| | ) | |
| FIFTH THIRD MORTGAGE CORP., and | ) | Judge Sarah L. Ellis |
| SAFE GUARD PROPERTIES, | ) | Magistrate Sidney I. Schenkier |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF
## SAFEGUARD PROPERTIES, LLC'S RULE 12(B)(6)
## MOTION TO DISMISS COUNTS I, VI, AND VII OF PLAINTIFF'S COMPLAINT

Plaintiff asserts a claim against Safeguard Properties, LLC ("Safeguard") under the Fair

Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA") and asserts claims against

both Safeguard and Fifth Third Mortgage Corp. ("Fifth Third") for: (1) trespass; (2) trespass to

chattels; (3) conversion; (4) negligence; (5) intentional infliction of emotional distress; and (6)

violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). These

claims are based on allegations that Fifth Third and/or Safeguard broke into Plaintiff's property,

changed the locks, took certain of Plaintiff's possessions and winterized the property.

However, plaintiff's FDCPA, (Count I), intentional infliction of emotional distress

(Count VI) and ICFA claims (Count VII) must be dismissed as a matter of law. Plaintiff's

FDCPA count must be dismissed as none of plaintiff's allegations plausibly suggest that

Safeguard engaged in any "debt collection" activities prohibited by the FDCPA, nor do they

suggest that Safeguard engaged in any activity that constitutes "nonjudicial action to effect

dispossession or disablement" of plaintiff's home. See 15 U.S.C. § 1692f(6). Consequently, the

FDCPA claims in Counts I should be dismissed pursuant to Rule 12(b)(6).

Similarly, plaintiff's ICFA claim also fails to allege that Safeguard engaged in any deceptive conduct that violates the ICFA. Additionally, plaintiff's IIED claim must fail because plaintiff has not alleged extreme and outrageous conduct, nor has he alleged that he has suffered emotional damages as those terms are defined under Illinois law. Therefore, Counts I, VI and VII of Plaintiff's Complaint should also be dismissed with prejudice pursuant to Rule 12(b)(6).

## FACTS

### I.     Plaintiff's Allegations

In alleged support of his purported claim, plaintiff alleges that Safeguard is "in the business of securing and preserving property for mortgage lenders and others in the foreclosure industry." Compl. ¶6. Plaintiff alleges that on or about February 18, 2014, Safeguard "and or its agents" broke into his property, changed the locks, winterized the property, and removed plaintiff's personal items. *Id.* ¶ 12-13. Based on these alleges events, plaintiff brings numerous causes of action against Safeguard and other defendants.[1] Count I seeks damages under the under the Fair Debt Collection Practices Act ("FDPCA"), 15 U.S.C. 1692 *et seq.*, based upon the notices purportedly left by Safeguard and its alleged agents as they allegedly "threatened to take nonjudicial action to effect the dispossession or disablement" of plaintiff's property; Count VI is a claim for intentional infliction of emotional distress; and Count VII alleges violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*

## LEGAL STANDARD

The Federal Rules of Civil Procedure require a Plaintiff to allege "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009). "[N]aked assertions devoid of further factual

---

[1] Concurrent with this motion, Safeguard has filed its answers to plaintiff's common law claims of trespass, trespass to chattel, conversion, and negligence.

enhancement" that are merely consistent with a violation of law do not satisfy this standard. *Iqbal,* 556 U.S. at 678 (internal quotation marks omitted). Instead, a plaintiff must allege facts that establish a claim to relief that is plausible on its face and which allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. Allegations that are "consistent with" liability but which have "more likely explanations" do not plausibly state claims for relief. *Id.* at 678-79. Further, allegations of fraud and/or deception and the circumstances constituting the same must be pled with particularity. See Fed. R. Civ. P. 9(b); *Windy City Metal Fabricators &Supply, Inc. v. CIT Tech. Fin. Servs., Inc.,* 536 F.3d 663, 670 (7th Cir. 2008).

## ARGUMENT

### I. THE COMPLAINT DEMONSTRATES THAT SAFEGUARD IS NOT A "DEBT COLLECTOR" UNDER THE FDCPA.

Plaintiff's allegations related to the purported entries on to this property are insufficient to establish a claim under the FDCPA. The FDCPA defines a "debt collector" as an entity that "uses any instrumentality of interstate commerce or the mails in any business the *principal purpose of which* is the collection of any debts, *or who regularly collects or attempts to collect,* directly or indirectly, debts owed or due or asserted to be owed or due another" and for limited purposes, also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. 15 U.S.C. § 1692a(6) (emphasis added).

Plaintiff, in conclusory fashion, states that Safeguard is a debt collector under the FDCPA because "because its principal business is the enforcement of security interests." Compl. ¶22. However, plaintiff's Complaint provides no factual allegation that supports this conclusion, and

3

indeed, the allegations of the Complaint contradict any argument that the principal business of Safeguard is debt collection or that Safeguard regularly collects or attempts to collect debts.

Indeed, not once does plaintiff claim that Safeguard collects debts on behalf of mortgage companies, attempts to collect debts on behalf of mortgage companies, or even has the authority to collect debts on behalf of mortgage companies. Moreover, not once does plaintiff allege that Safeguard attempted to "enforce" a security interest, nor does he allege that Safeguard used "any instrumentality of interstate commerce or the mails" to enforce a security interest on the bank's behalf. In fact, plaintiff has failed to even allege the *existence* of a security interest at his property, let alone that Safeguard was attempting to enforce such an interest with its actions.

Rather, plaintiff lists a series of activities that, in and of themselves, have nothing to do with either debt collection or enforcement of security interests. To the contrary, Safeguard's actions are taken pursuant to state law and municipal ordinances. The Illinois legislature has determined that vacant properties in default impose significant social and economic costs on the surrounding communities and on the State:

> The General Assembly find that residential mortgage foreclosures and the abandoned properties that sometimes follow create enormous challenges for Illinois residents, local governments and the courts, reducing neighboring property values, reducing the tax base, increasing crime , placing neighbors at greater risk of foreclosure, imposing additional costs on local governments, and increasing the burden on the courts of the State; conversely, maintaining and securing abandoned properties stabilizes property values and the tax base, decreases crime, reduces the risk of foreclosure for nearby properties, thus reducing costs for local governments and making a substantial contribution to the operation and maintenance of the courts of this State by reducing the volume of matters which burden the court system in this State.

735 ILCS 5/15-1108. Consistent with that concern, the City of Chicago *requires* that within 45 days of a default, "a mortgagee shall determine, on a monthly basis if the building on the real estate subject to its mortgage is vacant." Chicago Mun. Ord. 13-12-127(b), (attached as Exhibit

A hereto). If the property is found to be vacant, the mortgagee **must**, within 30 days, take certain steps to secure the property, including "secure the building's doors and windows" and "winterize the building." *Id.* The Fair Housing Administration imposes similar requirements for properties, nationwide, that it insures. See 5/13/2010 HUD letter to all approved mortgagees (No. 2010-18) (attached as Exhibit B hereto).[2] Cases interpreting these regulations have found that HUD regulations do **not** require the initiation of a "foreclosure proceeding" and an award of "possession" before obligations under the regulations can be performed. *See Fireman's Fund Mortgage Co. v. Zollicoffer*, 719 F.Supp. 650, 658 (N.D. Ill. 1989). In short, the services Safeguard provides that are at issue here are intended to comply with local requirements and federal guidance, not for the purpose of collecting on a debt.

Indeed, several recent Illinois District Court decision have ruled that the property preservation services conducted by Safeguard do not constitute the collection of a debt. In *Alqaq v. CitiMortgage et al.*, the plaintiff filed an almost identical lawsuit on behalf of the plaintiff against Safeguard for alleged violations of the FDCPA, the ICFA, trespass and invasion of privacy. 2014 WL 1689685 (N.D. Ill. Apr. 29, 2014). Similar to this lawsuit, the plaintiff in *Alqaq* alleged that Safeguard performed its property preservation services at the plaintiff's home prior to the entry of foreclosure. *Id.* at *3-*4. Safeguard summarily moved to dismiss the FDCPA claims, and the deceptive practices portions of the ICFA claims. Plaintiff's counsel argued that Safeguard was a debt collector under the FDCPA in that it uses the mail and interstate commerce to "enforce security interests."

On April 29, 2014, Judge Hart rejected these arguments and granted Safeguard's motion to dismiss, finding that Safeguard was not a debt collector under the FDCPA. Judge Hart found

---

[2] "A district court may take judicial notice of matters that are of public record" without converting a Rule 12(b)(6) motion into a motion for summary judgment. *United Stated v. Wood*, 925 F.2d 1580 (7th Cir. 1991).

that Safeguard's work is mandated by "federal mortgage regulations, Illinois law, and municipal ordinances...the 'principal purpose' of such businesses is not a debt collection or the enforcement of security interests, but rather securing property." *Id.* at p. 8. Rather the alleged conduct of Safeguard "was incidental to debt collection and was not dispossession or disablement of property to enforce a security interest within the purview of Section 1692(f)(6)(A)." *Id.* at p. 10. *See also Platek v. Safeguard Properties Inc.,* CIV.A. 12-1607, 2014 WL 2808908 at *1 (W.D. Pa. June 19, 2014) (Adopting *Alqaq* and finding that Safeguard's property preservation activities did not constitute debt collection under the FDCPA.)

Similarly, in the recently decided *Deegan v. Safeguard Properties, Inc.,* Judge Milton Shadur dismissed FDCPA allegations against Safeguard filed by another plaintiff almost identical to the allegations here. No. 13 C 4840 (September 13, 2013). A true and correct copy of the September 13, 2013, transcript is attached hereto as Exhibit C. In *Deegan,* the plaintiff also alleged that Safeguard impermissibly entered his property prior to the entry of a foreclosure order. The plaintiff in *Deegan* contended that Safeguard was a debt collector, as defined by Section 1692(a), because "Safeguard regularly collects or attempts to collect the debts owed to lenders or mortgage servicers and/or enforce the security interests of lenders or mortgage servicers..." Safeguard moved to dismiss *Deegan's* FDCPA claims, arguing, as it does here, that Safeguard is not a debt collector under the FDCPA.

Judge Shadur agreed with Safeguard, ruled that Safeguard Properties was not a debt collector as defined by the FDCPA, and dismissed the FDCPA allegations against Safeguard in that matter. (See, Exhibit C, pp. 3-10, Transcript from September 13, 2013). Judge Shadur specifically found the plaintiff's argument that Safeguard enforced security interests unpersuasive:

"MR. BULGARELLI: And, your Honor, I believe though -- and pardon me because I don't have the standard here and it may be direct in plaintiff's pleading, but the FDCPA standard says that the principal purpose is the collection of debt but does not require the principal purpose requirement for the enforcing of the security interest. And that is the fine distinction in regards to this.

THE COURT: I am sorry, that doesn't fly.... But the point is that if you think about the real world aspect of this, this thing clearly falls on the other side of whatever line there is, even though the particular line may be amorphus, not in this situation. I just don't find it persuasive to characterize Safeguard Properties which is engaged in a different kind of enforcement. And as I started out by telling you, I recognize that people, in order to avoid the kind of unpleasantness that is involved in let's say invasion of property and shutting things down and so on, are then much more likely to try to get their debts paid. I understand that.

But that is not the test. It is really not the test. <u>Because if that were the case, then almost anybody who is somehow collaterally involved in the process but really doesn't do anything about collecting the debt would be subject to a statute that was not drafted to cover them.</u> And that is the problem that I see existing here. So that is my -- that is my take on it. And as I say, I understand and I respect the opinions of some of my colleagues who in whatever situations are presented before them may come to a different view, but I don't."

*Id.*

Additionally, in *Allen v. Chase Home Finance LLC*, 2011 WL 3882814, *3 (N.D. Ill. Sept. 2, 2011), Judge Kendall dismissed with prejudice a complaint against Safeguard and other defendants because it was "clear from [plaintiff's] allegations and the documents attached to the complaint that Safeguard [and another defendant] were not attempting to collect a debt from [plaintiff], but merely following work orders" from the creditor to "secure the property" and "prevent damage to it." *Allen*, slip op., at *3. There, as here, Safeguard "[n]ever asked her for money or to repay any debt." *Allen*, slip op., at *3.

In light of these decisions, plaintiff's Complaint contains no factual support for his conclusory claim that Safeguard is a "debt collector" under the FDCPA.[3] Accordingly, plaintiff's FDCPA claim against Safeguard as a purported "debt collector" should be dismissed with prejudice.

## II.     PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM CANNOT SURVIVE UNDER ILLINOIS LAW

Plaintiff has also failed to assert a claim under an intentional infliction of emotional distress theory of liability. Under Illinois law, a plaintiff seeking recovery for intentional infliction of emotional distress must allege facts showing that: (1) the conduct involved was truly extreme and outrageous; (2) the actor either intended that his conduct inflict severe emotional distress, or knew that there was at least a high probability that his conduct would cause severe emotional distress; and (3) the conduct did cause severe emotional distress. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85 (1976).

### a.  Plaintiff Does Not Allege Sufficient Facts To Demonstrate That The Defendants Engaged In Extreme And Outrageous Conduct

To recover for intentional infliction of emotional distress, the defendant's behavior must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," and the emotional distress caused by such behavior must be "so severe that no reasonable man could be expected to endure it." *Public Finance Corp.,* 66 Ill.2d 85, 90. This is a stringent standard that courts maintain so as not to allow recovery for "mere insults,

---

[3] Plaintiff's Complaint contains no factual support for its conclusory claim that Safeguard is a debt collector under the FDCPA. Indeed, even if this Court wanted to find that Safeguard performs some debt collection services, Safeguard would still not be considered a debt collector under the FDCPA because any purported debt collection activities are incidental to its primary responsibilities of property preservation. *See Harris v. Liberty Cmty. Mgmt., Inc.,* 702 F.3d 1298 (11th Cir. 2012) (Property management company's collection of unpaid assessments on behalf of a homeowners association was incidental to the company's bona fide fiduciary obligations to the association, and therefore the management company fell within statutory exemption to FDCPA.)

indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46, cmt. d (1965).

Plaintiff's allegations do not reach the level of extreme and outrageous conduct. The sole bases of plaintiff's IIED claim are (1) the alleged unlawful entry into the subject Property while plaintiff was not present; and (2) the removal plaintiff's belongings from the Property. This conduct does not meet the high threshold for extreme and outrageous conduct as it exists in Illinois. *See, e.g., Rumbold v. Town of Bureau*, 221 Ill. App. 3d 222 (3rd Dist. 1991) (Farmer's allegation that he suffered emotional distress when his grain was seized under invalid ordinance setting highway weight limits was insufficient to state claim against town and township highway commissioner for intentional infliction of emotional distress).

This was the result reached by other courts in this District that have dismissed almost identical IIED claims against Safeguard. In *Jackson v. Bank of New York,* the plaintiffs alleged that Safeguard performed its property preservation services prematurely, thereby seizing plaintiff's property, and removing the plaintiffs' personal property, unlawfully while the plaintiff was not home. 2012 WL 2503956 at *1 (N.D. Ill. June 28, 2012.) The *Jackson* court granted Safeguard's motion to dismiss, finding that the plaintiffs had failed to state an IIED claim as there was "nothing objectively outrageous" about Safeguard's conduct. *Id.*

Similarly, in *Seehawer v. BAC Home Loan Servicing, L.P.* 13-CV-05715, the plaintiffs asserted an IIED claim against Safeguard related to property preservation services performed at the plaintiffs' house. A true and correct copy of the *Seehawer* opinion is attached here as Exhibit D. In stark contrast to plaintiff's complaint, one of the plaintiffs in *Seehawer* was allegedly *present* when Safeguard allegedly performed its activities, and allegedly interacted with Safeguard's independent contractors. Exhibit D,

p.2. Following *Jackson*, the *Seehawer* court granted Safeguard's motion to dismiss, finding that the plaintiffs had failed to state an IIED claim as there was "nothing objectively outrageous" about Safeguard's conduct. *Id.* at 3. Both Judge Dow and Judge Norgle have found, as a matter of law, that there is "nothing objectively outrageous" about Safeguard's property preservation services.

Here, plaintiff was not home when Safeguard allegedly secured the property and removed the belongings from his home. Indeed, and in contrast to the *Seehawer* decision, plaintiff does not allege *any* contact whatsoever with Safeguard during the alleged incident. This type of conduct is far from being so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. Even though plaintiff uses the phrase "extreme and outrageous" in his complaint, plaintiff has not alleged, and cannot allege, any set of facts that would make Safeguard's conduct "extreme and outrageous" as a matter of law.

Additionally, plaintiff alleges that as a result of Safeguard's alleged actions, he "had tears in his eyes," has stress headaches, has lost sleep, and was embarrassed Compl. ¶54(c). Such allegations are inadequate, as Illinois law is well-settled that fear and worry alone are insufficient to sustain an IIED claim. *See Witkowski v. St. Anne's Hosp. of Chicago, Inc.,* 113 Ill. App. 3d 745, 753, (1st Dist. 1983) *citing Public Finance Corp.,* 66 I11.2d 85, 90 ("[I]nfliction of emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be severe. Although fright, horror, grief, shame, humiliation, worry, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable.") (Emphasis added). Accordingly,

under settled Illinois law, plaintiff cannot sustain an IIED claim against Defendants, and therefore, Count VI of plaintiff's complaint should be dismissed with prejudice.

### b. Plaintiff's Allegations Fail To Show That The Defendants Intended Or Knew There Was A High Probability That Their Conduct Would Cause Severe Emotional Distress

Plaintiff's IIED claim also fails as plaintiff has failed to allege the requisite intent or knowledge by the Defendants. To state a cognizable claim for intentional infliction of emotional distress, the plaintiffs must show that the defendant either intended its conduct inflict severe emotional distress, or knew that there is at least a high probability that its conduct would cause severe emotional distress. *McGrath v. Fahey,* 126 Ill.2d 78, (1988).

In contrast to other Illinois decisions, the complaint contains no facts whatsoever that Safeguard knew that McCurdy would be particularly susceptible to emotional distress related to his home. *See* i.e. *McGrath v. Fahey,* 126 Ill.2d 78, *Kolegas v. Heftel Broad. Corp.,* 154 Ill. 2d 1, 23 (1992) (Reasonable to infer that plaintiffs were emotionally susceptible to comments related to the plaintiff's wife's appearance when the plaintiff informed the defendants that his wife and child were afflicted with neurofibromatosis.) The facts alleged by plaintiff do not substantiate the allegations that Defendants intended or knew that their conduct would cause severe emotional distress, nor can the plaintiffs allege any set of facts that would support such. These omissions are fatal, and Count IV should be dismissed accordingly.[4]

### III. PLAINTIFF'S ICFA CLAIM MUST BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE THAT SAFEGUARD ENGAGED IN ANY DECEPTIVE CONDUCT.

The Court should also dismiss Count VII of plaintiff's complaint because it fails to state a claim against Safeguard under the ICFA. To state an ICFA claim, a plaintiff must allege

---

[4] Safeguard also adopts and incorporates arguments made by co-defendant Fifth Third in their Motion to Dismiss Count VI of Plaintiff's Complaint (Dkt. 10) as if fully restated herein.

deceptive or unfair conduct. *See Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417, 775 N.E.2d 951, 960 (2002). To state a claim under the ICFA based on deceptive conduct, a plaintiff must allege: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff (5) proximately caused by the deception. *De Bouse v. Bayer AG*, 235 Ill.2d 544, 550, 922 N.E. 2d 309, 313 (2009). Claims alleging "deceptive conduct" must be pled "with particularity" pursuant to Federal Rule of Civil Procedure 9(b). See Fed. R. Civ. P. 9(b); *Windy City*, 536 F.3d at 670. Plaintiff's complaint falls short under such a standard.

The complaint contains no allegations that Safeguard engaged in deceptive conduct. Rather, the sole allegations are that Safeguard violated the ICFA when it "trespassed into plaintiff's property, removed his possessions, winterized his property, and on information and belief charged his (sic) for doing so." Compl. ¶58. Put simply, plaintiff appears to be contending that an unauthorized entry, in and of itself, is a "deceptive" act under the ICFA. This conclusory statement is simply insufficient to assert an action under the ICFA, as an unauthorized entry, in and of itself, is not "deceptive." Safeguard has no commercial relationship with the plaintiff, and thus there could be no intent to induce plaintiff to rely on Safeguard's purported actions.

This was the same conclusion recently reached by the *Alqaq* court. As discussed above, the plaintiff in *Alqaq* filed an almost identical deceptive practices claim under the FDCPA for the alleged *See* Exhibit C, p. 12. The *Alqaq* court dismissed this claim as well, specifically finding that "the conduct of [Safeguard] was not deceptive." *Id.* at p. 12.

Plaintiff's ICFA claims should meet the same result, as plaintiff has failed to allege any deceptive conduct or representations perpetrated by Safeguard via the alleged entries. Accordingly, any allegation of deceptive conduct by Safeguard must be dismissed.

## **CONCLUSION**

For the foregoing reasons, Safeguard Properties, LLC, respectfully requests that the Court dismiss Counts I, VI and VII of plaintiff's Complaint.

Respectfully submitted,

TRIBLER ORPETT & MEYER, P.C.

By: s/ Panos T. Topalis
    One of defendant's attorneys

Panos T. Topalis, Esq. - ARDC #06202025
Shomshon Moskowitz, Esq. – ARDC # 6297247
TRIBLER ORPETT & MEYER, P.C.
225 West Washington Street, Suite 1300
Chicago, Illinois 60606
(312) 201-6400

## CERTIFICATE OF SERVICE

The undersigned attorney deposes and states that a copy of **Defendant, Safeguard Properties', Memorandum in Support of its Rule 12(B)(6) Motion to Dismiss Counts I, VI and VII of Plaintiff's Complaint** was served upon:

Richard Miller
Miller Law Firm, P.C.
1051 Perimeter Dr., Suite 400
Schaumburg, IL 60173
richard.miller@millerlawfirm.org

Timothy Lawrence Binetti
Brittany E. Kirk
Dinsmore & Shohl LLP
135 S. LaSalle St.
Suite 3025
Chicago, IL 60603
Timothy.Binetti@dinsmore.com
Brittany.kirk@dinsmore.com


service was accomplished pursuant to ECF as to Filing Users and complies with LR 5.5 as to any party who is not a Filing User or represented by a Filing User by mailing a copy to the above-named attorney or party of record at the address listed above, from 225 W. Washington Street, Suite 1300, Chicago, IL 60606, prior to 5:00 p.m. on the 21st day of July, 2014, with proper postage prepaid.

s/ Panos T. Topalis

14

# EXHIBIT A



# Office of the Chicago City Clerk

Office of the City Clerk

## City Council Document Tracking Sheet



SO2011-8066

| | |
|---|---|
| **Meeting Date:** | 10/5/2011 |
| **Sponsor(s):** | Dowell, Pat (3)<br>Fioretti, Bob (2)<br>Suarez, Regner Ray (31) |
| **Type:** | Ordinance |
| **Title:** | Amendment of Chapter 13-12 of Municipal Code regarding vacant buildings |
| **Committee(s) Assignment:** | Committee on Housing and Real Estate |



EXHIBIT

A

## O R D I N A N C E
## AS AMENDED

### BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:

**SECTION 1.** Sections 13-12-125 and 13-12-135 of the Municipal Code of Chicago are hereby amended by deleting the language stricken through and by inserting the language underscored as follows:

**13-12-125  Vacant buildings – Owner required to act – Enforcement authority.**

(a)  (1)  The owner of any building that has become vacant shall within 30 days after the building becomes vacant or within 30 days after assuming ownership of the building, whichever is later, file a registration statement for each such building with the department of buildings on forms provided by that department for such purposes. The registration shall remain valid for six months from the date of registration. The owner shall be required to renew the registration for successive six-month periods as long as the building remains vacant and shall pay a registration or renewal fee in the amount prescribed in paragraph (3) of this subsection (a) for each registered building; provided, however, that all eleemosynary, religious, educational, benevolent or charitable associations organized on a not-for-profit basis and all governmental agencies shall be exempt from the payment of the registration fee. The owner shall notify the department of buildings, within 20 days, of any change in the registration information by filing an amended registration statement on a form provided by the department of buildings for such purposes. The registration statement shall be deemed prima facie proof of the statements therein contained in any administrative enforcement proceeding or court proceeding instituted by the city against the owner or owners of the building. Registration of a building in accordance with this section shall be deemed to satisfy the registration requirement set forth in Section 13-10-030 and the notification requirement set forth in Section 13-11-030. After filing a registration statement the building owner shall provide access to the city to conduct an exterior and interior inspection of the building to determine compliance with the municipal code, following reasonable notice, during the period covered by the initial registration or any subsequent renewal.

*(Omitted text is unaffected by this ordinance)*

(b)  The owner of any building that has become vacant, and any person maintaining, operating or collecting rent for any building that has become vacant shall, within 30 days, do the following:

(1)  enclose and secure the building as provided in Section 13-12-135 of this Code;

(2)  post a sign affixed to the building indicating the vacant building registration number and the name, address and telephone number of the owner and the owner's authorized agent for the purpose of service of process. The name, address and telephone number of a person responsible for day-to-day supervision and management of the building, if such person is different from the owner holding title or authorized agent shall be indicated on the sign as well. The sign shall be of a size and placed in such a location so as to be legible from the nearest public street or sidewalk, whichever is nearer;

*(Omitted text is unaffected by this ordinance)*

1

(e)     For purposes of this section, "vacant" means a building which is lacking habitual presence of human beings who have a legal right to be on the premises, or at which substantially all lawful business or construction operations or residential occupancy has ceased, or which is substantially devoid of content. In determining whether a building is vacant, it is relevant to consider, among other factors, the percentage of the overall square footage of the building or floor to the occupied space, the condition and value of any items in the building and the presence of rental or for sale signs on the property; provided that a residential property shall not be deemed vacant if it has been used as a residence by a person entitled to possession for a period of at least three months within the previous nine months and a person entitled to possession intends to resume residing at the property; and further provided that multi-family residential property containing ten or more dwelling units shall be considered vacant when ninety percent or more of the dwelling units are unoccupied.

~~For purposes of this section and section 13-12-135, "owner" has the meaning given to the term in Section 13-4-010, but also includes any person who alone, jointly or severally with others is a mortgagee who holds a mortgage on the property, or is an assignee or agent of the mortgagee.~~

### 13-12-135  Minimum requirements for vacant buildings.
For purposes of this section the ~~terms~~ term "vacant" ~~and "owner"~~ shall be defined as provided in section 13-12-125. In addition to any other applicable code requirements each vacant building must be kept in compliance with the following requirements for as long as the building remains vacant:
(a)     Lot maintenance standards – the lot the building stands on,. and the surrounding public way shall be maintained as follows:
(1)     all grass and weeds on the premises including abutting sidewalks, gutters and alleys shall be kept below ten (10) inches in height, and all dead or broken trees, tree limbs or shrubbery shall be cut and removed from the premises;

*(Omitted text is unaffected by this ordinance)*

**SECTION 2.** Chapter 13-12 of the Municipal Code of Chicago is hereby amended by inserting new Sections 13-12-126, 13-12-127 and 13-12-128 as follows:

### 13-12-126  Vacant buildings – Mortgagee required to act – Enforcement authority.
(a)     (1)     The mortgagee of any residential building that has become vacant and which is not registered pursuant to this section or Section 13-12-125(a) of this Code shall, within the later of 30 days after the building becomes vacant and unregistered or 60 days after a default, file a registration statement with the department of buildings on forms provided by that department for such purposes and pay a registration fee of $500.00. The registration shall remain valid for six months from the date of registration. The mortgagee shall be required to renew the registration every six months as long as the building remains vacant. There shall be no fee for such renewal. The mortgagee shall notify the department of buildings within 20 days of any change in the registration information by filing an amended registration statement on a form provided by the department of buildings for such purposes. The registration statement shall be deemed prima facie proof of the statements therein contained in any administrative enforcement proceeding or court proceeding instituted under this section by the city against the mortgagee with respect to the registered building.

(2)     In addition to other information required by the commissioner of buildings, the registration statement shall include the name, street address and telephone number of a natural person, 21 years of age or older, or business entity registered with the Illinois Secretary of State designated by the mortgagee as an authorized agent for receiving notices of code violations and for receiving process in any court proceeding or administrative enforcement proceeding on behalf of such mortgagee in connection with enforcement of this section. This person or business entity must maintain an office in Cook County, Illinois, or must actually reside in Cook County, Illinois. A mortgagee meeting these criteria may designate itself as agent. By designating an authorized agent under the provisions of this subsection a mortgagee consents to receive any and all notices of violations of this section concerning the registered building and all process in any court proceeding or administrative enforcement proceeding brought to enforce this section with respect to the registered building by service of the notice or process on the authorized agent. Any mortgagee who has designated an authorized agent under the provisions of this subsection shall be deemed to consent to the continuation of the agent's designation for the purposes of this subsection until the mortgagee notifies the department of buildings of a change of authorized agent or until the mortgagee files a new registration statement. The city shall notify the designated agent of all violations and enforcement proceedings brought under this section.

(b)     The mortgagee of any residential building that has become vacant and which is not registered pursuant to Section 13-12-125(a) of this Code shall, within the later of 30 days after the building becomes vacant and unregistered or 60 days after a default:

(1)     secure the building's doors and windows so that all such building openings are closed and secured, using secure doors, windows without broken or cracked panes, commercial-quality metal security panels, filled with like-kind material as the surrounding wall, or boarded with plywood installed and secured in accordance with rules and regulations issued by the commissioner of buildings.  At least one building entrance shall be accessible from the exterior and secured with a door that is locked to allow access only to authorized persons. If two or more exit doors exist, a  minimum of two exit doors shall be available to exit from the interior of the building, with at least one exit door available per 150 linear feet of horizontal travel at ground-floor level;

(2)     maintain all grass and weeds on the residential real estate premises, below 10 inches in height and cut and remove all dead or broken trees, tree limbs or shrubbery;

(3)     clear or remove snow from the walkway leading to the main entry door, and any public sidewalk adjoining the lot;

(4)     abate the accumulation of debris, trash and litter that does not constitute personal property on any portion of the exterior lot of the building;

(5)     reasonably maintain fences and gates;

(6)     reasonably maintain the structural integrity of stairs and steps that lead to the main entrance of the building;

(7)     winterize the building, which shall mean cleaning all toilets and completely draining all plumbing and heating systems.

(8)     maintain and secure the exterior of the building;

3

(9)     post signs affixed to the building indicating: the vacant building registration number and the name, address and telephone number of the mortgagee and the mortgagee's authorized agent for the purpose of service of process. The name, address and telephone number of a person responsible for day-to-day supervision and management of the building, if such person is different from the mortgagee or authorized agent shall be indicated on the signs as well. The signs shall be no smaller than 8.5 inches by 11 inches and placed in such a location so as to be visible and legible from the nearest public street or sidewalk, whichever is nearer, and from the alley;

(10)    maintain the building in a secure and closed condition and maintain the sign until the building is reoccupied or demolished with all permits required by this Code. If during the registration period and following the initial boarding and securing of the property in compliance with this section the department of buildings notifies the mortgagee in writing that the property was found open or it has been judicially or administratively found to be open, in each case on two separate occasions at least 30 days apart then the building shall thereafter be secured only with commercial-quality metal security panels or a method deemed equivalent by the commissioner of buildings; and

(11)    keep the exterior of the property free of vermin and rodents.

(c)     Any person who violates any provision of this section or of the rules and regulations issued hereunder shall be fined not less than $500.00 and not more than $1,000.00 for each offense. Every day that a violation continues shall constitute a separate and distinct offense. The following shall be affirmative defenses under Section 13-12-126 and Section 13-12-127:

(1)     That at the time of the violation the building was occupied by any number of persons lawfully or unlawfully;

(2)     That the owner or another mortgagee has registered the building pursuant to Section 13-12-125 or Section 13-12-126 as applicable and such registration is current;

(3)     That the mortgagee is barred from doing any action required by this section by an automatic stay pursuant to a bankruptcy proceeding, provided that the mortgagee tenders evidence including the bankruptcy case number; and

(4)     That the mortgagee has cured all violations within 30 days of receiving written notice of such violations. Notice sent by U.S. mail, shall be deemed received seven days after mailing. An affidavit shall be conclusive proof of mailing.

(5)     That at the time of the violation, the mortgage was not in default;

(6)     That at the time of the violation, the mortgagee was not the senior lienholder of record on the real estate;

(7)     That a receiver has been appointed for the property by a court of competent jurisdiction.

4

(8)     That in a foreclosure of the property, the owner or mortgagor is taking any of the following acts:

(A)    filing any pleading which asserts claims against the mortgagee or defenses;

(B)    filing any motion which asserts defenses or claims against the mortgagee;

(C)    filing any discovery for response by the mortgagee; or

(D)    filing a request for mediation.

(d)     The commissioner of buildings may issue rules and regulations for the administration of this section.

(e)     For purposes of this section, the following terms shall be defined as set forth below:

(1)     "Default" shall mean, with respect to a residential building containing four or fewer dwelling units, when the mortgagor is 60 days past due on the mortgagor's obligation to make a scheduled payment under a mortgage or a mortgage note. With respect to all other residential buildings, "default" shall mean when the mortgagor is 90 days past due on the mortgagor's obligation to make a scheduled payment under a mortgage or a mortgage note.

(2)     "Mortgage" shall mean any consensual lien created by a written instrument which grants or retains an interest in real estate to secure a debt or other obligation. The term includes, without limitation: (A) mortgages securing reverse mortgage loans; (B) mortgages securing revolving credit loans; (C) every deed conveying real estate, although an absolute conveyance in its terms, which shall have been intended only as a security in the nature of a mortgage; and (D) equitable mortgages.

(3)     "Mortgagee" shall mean (A) the holder of an indebtedness or obligee of a non-monetary obligation secured by a mortgage or any person designated or authorized to act on behalf of such holder (B) any person claiming through a mortgagee as successor and (C) any person identified as such in a recorded document which has not been released, assigned, or superseded of record.

(4)     "Mortgagor" shall mean (A) the person whose interest in the real estate is the subject of the mortgage and (B) any person claiming through a mortgagor as successor. Where a mortgage is executed by a trustee of a land trust, the mortgagor is the trustee and not the beneficiary or beneficiaries.

(5) "Vacant" shall mean any real estate improved with a complete structure containing one or more dwelling units or an incomplete structure if the real estate is zoned for residential development, where the structure is empty or otherwise uninhabited by persons and the structure or lot is in need of maintenance, repair or securing, and with respect to which one or more of the following conditions exist:

(1) all lawful business or construction operations have ceased for 6 months;
(2) it has been declared unfit for occupancy and ordered to remain vacant and unoccupied under an order issued by either the building commissioner, president of the

5

board of health, the fire commissioner or the superintendent of police pursuant to 13-12-120 or by an order issued by court of competent jurisdiction;

(3) no construction or legal repairs have commenced for 6 months;

(4) the doors or windows are smashed through, broken, unhinged, removed or continuously unlocked;

(5) law enforcement officials have received at least one report of trespassers or vandalism or other illegal acts being committed at the property in the last 6 months;

(6) gas, electrical or water services to the entire premises have been terminated.

A property shall not be considered vacant if: (i) there is an unoccupied building which is undergoing construction, renovation, or rehabilitation that is proceeding diligently to completion, and the building is in compliance with all applicable ordinances, codes, regulations and legislation; (ii) there is a building occupied on a seasonal basis, but otherwise secure; (iii) there is a secure building on which there are bona fide rental or sale signs; or (iv) there is a building that is secure, but is the subject of a probate action, action to quiet title, or other ownership dispute; or (v) there is otherwise a building that is secure and in substantial compliance with all applicable ordinances.

(f)     If a building is registered under paragraph (a) of this section, only the registered mortgagee shall be liable under this section during the registration period. Nothing in this section shall bar the concurrent enforcement of any provision of this Code against the owner or owners of a property.

(g)     To the extent permitted by law, a mortgagee's acts or omissions required by this section shall not subject the mortgagee to civil or criminal liability unless the act or omission constitutes gross negligence or willful, wanton, or intentional misconduct. This provision shall not waive the requirement to obtain permits or licenses for performing certain work required under this section, as otherwise required by this Code, or the penalties provided for failure to do so.

### 13-12-127 Mortgagee to inspect real estate.

(a)     For purposes of this section the terms "default," "mortgage," "mortgagee," "mortgagor," and "vacant" shall be defined as provided in Section 13-12-126(e).

(b)     Beginning 45 days after a default, a mortgagee shall determine, on a monthly basis, if the building on the real estate subject to its mortgage is vacant. Such determination may be made by communication with the mortgagor, a visual inspection of the real estate, or other means reasonably calculated to determine if the building is vacant.

(c)     This section shall not require a mortgagee to perform any action which it is barred from doing by an automatic stay pursuant to a bankruptcy proceeding.

(d)     To the extent permitted by law, a mortgagee's acts or omissions required by this section shall not subject the mortgagee to civil or criminal liability unless the act or omission constitutes gross negligence or willful, wanton, or intentional misconduct.

### 13-12-128 Termination.

(a)     For purposes of this section the terms "mortgage," "mortgagee," and "vacant" shall be defined as provided in Section 13-12-126(e).

6

(b)     Upon the occurrence of any of the following, the requirements of Sections 13-12-126 and 13-12-127 shall terminate with respect to a mortgagee:

(1)     recorded assignment of the mortgagee's mortgage;

(2)     recorded satisfaction or release of the mortgagee's mortgage;

(c)     Upon the occurrence of any of the following, the requirements of Sections 13-12-126 and 13-12-127 shall terminate with respect to a building:

(1)     recorded conveyance of title to the underlying real estate, pursuant to foreclosure proceedings or otherwise:

(2)     the building ceases to be vacant; or

(3)     the building is demolished with all permits required by this Code.

(d)     Within 20 days of termination pursuant to this section, a mortgagee shall notify the department of buildings on a form provided by the department of buildings for such purpose.


**SECTION 3.** This ordinance takes effect 10 days after its passage and publication.


_____          _____
Pat Dowell                       Ray Suarez
Alderman, 3d Ward                Alderman, 31st Ward


7



# RAY SUAREZ

**ALDERMAN, 31st WARD**
VICE MAYOR - CITY OF CHICAGO

4502 WEST FULLERTON AVENUE
CHICAGO, ILLINOIS 60639
TELEPHONE: (773) 276-9100
FAX: (773) 276-2596

WWW.WARD31.COM

COMMITTEE MEMBERSHIPS:

HOUSING AND REAL ESTATE
(CHAIRMAN)

COMMITTEES, RULES AND ETHICS
(VICE-CHAIRMAN)

AVIATION

BUDGET AND GOVERNMENT OPERATIONS

FINANCE

TRANSPORTATION AND PUBLIC WAY

WORKFORCE DEVELOPMENT AND AUDIT

ZONING, LANDMARKS AND BUILDING STANDARDS

CITY COUNCIL · CITY OF CHICAGO
CITY HALL, ROOM 200
121 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60602
TELEPHONE: (312) 744-6102
FAX: (312) 744-0770
RSUAREZ@CITYOFCHICAGO.ORG

**November 2, 2011**
**CHICAGO, ILLINOIS**

### TO THE PRESIDENT AND MEMBERS OF THE CITY COUNCIL:

Your Committee on Housing and Real Estate which was referred an ordinance (As Amended in Committee on 10/17/11, introduced by Alderman Pat Dowell (3rd Ward), Alderman Ray Suarez (31st Ward) and Alderman Robert W. Fioretti (2nd Ward), amending Chapter 13-12 of the Municipal Code regarding vacant buildings. (O2011-8066)

Having the same under advisement, begs leave to report and recommend that Your Honorable Body **Pass** the proposed ordinance transmitted herewith.

This recommendation was concurred in by a unanimous vote of the members of the joint committee present with no dissenting votes.

Respectfully submitted,

(signed)

Ray Suarez, Chairman
Committee on Housing & Real Estate

# EXHIBIT B



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

OFFICE OF HOUSING

May 13, 2010                  **MORTGAGEE LETTER 2010-18**

TO:               **ALL APPROVED MORTGAGEES**

ATTENTION:      **Single Family Servicing Managers**

SUBJECT:        **Update of Property and Preservation (P&P) Requirements
and Cost Reimbursement Procedures**

       This Mortgagee Letter provides updated consolidated property and preservation (P&P) guidance for foreclosed properties that had been secured by FHA-insured mortgages, and provides cross-references to the compliance requirements within HUD handbooks, regulations and current P&P guidelines. This Mortgagee Letter:

- Changes the process requirements for over-allowable expenses, including;
  - o Setting a per property allowable cost limit; and
  - o Mandating submission of all documents to the Mortgagee Compliance Manager (MCM) through HUD's P260 system;
- Emphasizes FHA's current conveyance condition standards; and also,
  - o Re-introduces requirements for removal of interior debris and maintain the property in broom-swept condition; and
- Reminds servicers of FHA's inspection requirements.

       This Mortgagee Letter and its attachment (Exhibits A and B) supersede Mortgagee Letter 2008-31 (and its attachment) in its entirety.

**Effective Date of Mortgagee Letter**

       The requirements presented herein are effective on July 13, 2010.

**Changes to Over-allowable Requests**

       Pursuant to the guidance issued herein, a mortgagee may request over-allowable approval from HUD only if its property and preservation costs exceed $2,500 per property. This $2,500 property and preservation amount does not include one time major repair items – e.g. roof replacement and demolition. Exhibit B to this Mortgagee Letter lists the new maximum property preservation allowable cost schedule, which also includes a per item cost maximum. Property and preservation charges that exceed $2,500 per property must be pre-approved by HUD's MCM through the web-based P260 internet portal. The process for over-allowable approval is described

www h

in Exhibit A, Section 1, page 5.

*Mortgagee Compliance Manager*

The MCM is the single point of contact designated by HUD to administer all mortgagee compliance functions, including property preservation activities. For additional information regarding the MCM, please see Mortgagee Letter 2010-16. The MCM will also audit all Single Family Applications for Insurance Benefits, form HUD 27011, parts B-D to evaluate the claimed amounts against the allowable charges in Exhibit B of this Mortgagee Letter to ensure that the Department is not overcharged.

*HUD's P260 Web-based Internet Portal*

P260 is the Department's new web-based internet portal. P260 provides mortgagees and HUD real-time access to requests, notifications, approvals and document submissions for pre- and post-conveyance activities. For additional information on P260, refer to Mortgagee Letter 2010-16.

**Conveyance Condition Standards**

At the time of conveyance to HUD, a property must be undamaged by fire, earthquake, flood, hurricane, tornado, boiler explosions (for condominiums that were secured by mortgages insured under §234 of the National Housing Act), or mortgagee neglect. In addition, any debris must be removed from the interior of the property and maintained in broom-swept condition. These standards are fully described in Exhibit A, Section 2 "Acceptable Conveyance Condition."

**Inspections**

Generally, the mortgagee is responsible for three types of inspections:
- Occupancy Inspections;
- Initial Vacant Property Inspections; and
- Vacant Property Inspections.

These inspection types are fully described in Exhibit A, Section 6 (A) "Inspections."

**Information Collection Requirements**

The information collection requirements contained in this document have been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520) and assigned OMB control numbers 2502-0429 and 2502-0523. In accordance with the Paperwork Reduction Act, HUD may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collections request displays a currently valid OMB Control Number.

2

If you have any questions concerning this Mortgagee Letter, please contact HUD's National Servicing Center at (888) 297-8685. Persons with hearing or speech impairments may call via TDD/TTY on 1-877-TDD-2HUD (1-877-833-2483).

Sincerely,

David H. Stevens
Assistant Secretary for Housing –
Federal Housing Commissioner

Attachment

3

HUD/FHA Property and Preservation Guidelines

| Document | | Page |
|---|---|---|
| Exhibit A | General Requirements | 5-14 |

**No.     Title**

| | Mortgagee Responsibility | 5 |
|---|---|---|
| | Damage Due to Failure to Preserve and Protect (Mortgagee Neglect) | 5 |
| 1. | Maximum Property Preservation Allowance and Over-Allowable Expense Request | 5 |
| 2. | Acceptable Conveyance Condition | 6 |
| 3. | Conveyance of Properties | 6 |
| 4. | Local Requirements | 7 |
| 5. | Photographs | 7 |
| 6. | Specific Preservation Requirements | 7 |
| | A. Inspections | 7 |
| | B. Securing | 8 |
| | C. Roof Repair | 9 |
| | D. Pools, Hot Tubs and Spas | 9 |
| | E. Boarding | 9 |
| | F. Yard Maintenance and Snow Removal | 10 |
| | G. Winterization Requirements | 11 |
| | H. Demolition | 12 |
| 7. | Claim Submission and Documentation | 12 |
| 8. | Requests to Exceed Timeframes | 13 |
| 9 | Appeal of a Demand for Reimbursement | 13 |
| 10. | Record Retention | 14 |
| 11. | Enforcement | 14 |
| Exhibit B | Maximum Property Preservation Allowances | 15-16 |

4

**Exhibit A:  GENERAL REQUIREMENTS FOR PROPERTY AND PRESERVATION
OF PROPERTIES SECURED BY FHA INSURED MORTGAGES**

<u>Mortgagee Responsibility</u>

Mortgagees shall preserve and protect foreclosed properties that were secured by FHA-insured
mortgages as required by 24 CFR § 203.377 through § 203.381 and 24 CFR § 234.270. The
decision as to what action to take to preserve and protect the property is the mortgagee's
responsibility and is independent of the amount that HUD reimburses. If a property that was
secured by an FHA-insured mortgage is conveyed with damage to the Secretary without prior
approval, the Department may reconvey the property or require a reduction to the claim for
insurance benefits, for the greater of the hazard insurance recovery or HUD's estimate of the cost of
repairing the damage.

**Damage Due to Failure to Preserve and Protect (Mortgagee Neglect)**

HUD will hold the mortgagee liable for property damage or destruction to vacant or abandoned
property resulting from the mortgagee's failure to take action to preserve and protect the property.
This failure to preserve and protect is considered mortgagee neglect. Examples of mortgagee
neglect include, but are not limited to, the mortgagee's failure to:

    a.  Adequately verify the occupancy status of a property;
    b.  Initiate foreclosure within the required timeframe;
    c.  Obtain timely and accurate property inspections;
    d.  Promptly secure and continue to protect all vacant properties; or
    e.  Promptly notify the MCM of receipt of code violations, demolition notices and/or
        take appropriate action.

Mortgagees may use any qualified individual or firm to perform P&P services on properties that
were secured by FHA-insured mortgages; however, the mortgagee remains fully responsible to
HUD for its actions and the actions of its agents, individuals and firms that performed such services.

**1.**    <u>Maximum Property Preservation Allowance and Over-Allowable Expense Request</u>

The maximum property preservation allowance is the maximum reimbursement for all P&P
expenses on an individual property without MCM approval. Maximum amounts for individual
items are set forth in Exhibit B- "Maximum Property Preservation Allowance". All reimbursements
are subject to the maximum allowable amounts.

If the total P&P expense exceeds the $2,500 maximum cost limit in Exhibit B, the mortgagee may
submit an over-allowable request in the 'Conveyance Overallowables Screen' (an electronic version
of Form HUD-50002, Request to Exceed Cost Limits), via the web-based P260 portal. The
mortgagee must upload all supporting documentation into P260, including a detailed description of
what actions were taken, along with verifiable, auditable documentation which includes an itemized
list of the repairs, materials used, room dimensions, receipts, and photographs. The MCM will

review the requests and supporting documentation and approve, deny or adjust the requested P&P allowance utilizing an industry standard cost estimator. The mortgagee must obtain the MCM's decision, which is recorded in P260. Requests must be submitted at least five (5) business days prior to the conveyance due date or will be rejected. However, the mortgagee may request an extension of the conveyance due date. For a one time major repair item, the mortgagee must enter the request and its supporting documentation into the P260 internet based web portal for review and approval or denial by the Mortgage Compliance Manager. The cost of the one time major repair item does not count toward the maximum allowable cost of $2,500 per property for property and preservation expenses.

HUD is not prescribing the amounts that mortgagees may pay for the services performed, but is standardizing a reasonable maximum allowance that HUD reimburses for such services.

## 2.  **Acceptable Conveyance Condition**

At the time of conveyance to HUD, a property must be undamaged by fire, flood, earthquake, hurricane, tornado, or mortgagee neglect, as set forth in and required by 24 CFR §203.378. For condominiums that were secured by mortgages insured under §234 of the National Housing Act, the property must also be undamaged by boiler explosion, as required by 24 CFR § 234.270. In addition, the property must be secured, the lawn maintained, winterized (as applicable), and interior and exterior debris must be removed with the property's interior maintained in broom-swept condition. This includes the removal of any vehicles and removal of any personal property in accordance with local and state requirements. Mortgagees are responsible for the damage to, or destruction of, properties due to their failure to take reasonable action to secure, inspect, preserve and protect such properties.

If a property is damaged due to mold resulting from the mortgagee's failure to protect and preserve, the mortgagee must remediate the cause of the mold and complete any other required P&P actions to minimize further mold and/or water damage prior to conveyance of the property.

## 3.  **Conveyance of Properties**

Mortgagees may convey damaged properties without prior written approval if there is damage resulting from Mortgagor neglect and the damage was discovered and documented at the initial inspection. The mortgagee must include a description of the damage in the "Mortgagee's Comments" section of Form HUD-27011, Part A, and mark Item 24. "Is the property conveyed damaged?" "no". (Note: marking **"yes"** in item 24, triggers HUD's claim system to look in item 26 for the date of HUD's approval to convey the property damaged and to item 27 for the amount that the claim is to be reduced.)

For properties that were damaged while under the control of the mortgagee or as a result of mortgagee neglect, the mortgagee must obtain approval from the MCM to convey the damaged property to HUD. However, as a matter of administrative practice, HUD generally will not deny conveyance of properties if the Government's estimate of the cost to repair the damage attributable to the mortgagee is equal to or less than $2,500. The claim is generally reduced by that amount.

The mortgagee must include documentation supporting the P&P work performed on the property. At a minimum, this documentation shall include evidence of the date of vacancy, validation of the property condition at vacancy, inspection reports, and a chronology of actions performed by the mortgagee to preserve and protect the property. If no documentation or inadequate documentation is received from the mortgagee, all the damage will be considered attributable to the mortgagee and HUD may either re-convey the property to the mortgagee or seek reimbursement from the mortgagee for HUD's estimate of the cost of the repairs.

**4.      Local Requirements**

If at any time local codes require more extensive protection than stated in this guidance, mortgagees shall contact the MCM.

**5.      Photographs**

P&P actions must be documented to include before and after pictures using digital photography. The photographic fee is included in the lock change/securing maximum allowable cost per property. Photographs are required to document property condition and all P&P claimed expenses.  All photographs shall be dated and labeled.  If photographs are not included at the time of the claim review, the expenses will be disallowed.

**6.      Specific Preservation Requirements**

   A.      **Inspections:**

For specific details about HUD Inspection Requirements see 24 CFR § 203.377 and HUD Handbook 4330.1, Rev- 5, Chapter 9-9, as it provides complete details on inspection requirements and types of inspections.

> There are three types of inspections:
> - Occupancy Inspections;
> - Initial Vacant Property Inspections; and
> - Vacant Property Inspections.

Inspection reports and photographs shall be submitted in P260 in support of the 27011 parts B - D claim request.

*Occupancy Inspection (Inspection at Initial Default)*

When a mortgage is in default because a payment was not received within 45 calendar days of the due date of the missed payment, and efforts to reach the mortgagor by telephone or correspondence have proven unsuccessful, the mortgagee must make an inspection to determine if the property is vacant or abandoned.

### *Initial Vacant Property Inspection*

An Initial Vacant Property Inspection is performed on the date the mortgagee takes physical possession of a vacant or abandoned property. The initial inspection is when the mortgagee ascertains the condition of the property, and may be of critical importance in distinguishing between mortgagor and mortgagee neglect following conveyance. If the occupancy inspection and initial vacant property inspection are performed on the same date, only one inspection fee will be reimbursed.

### *Vacant Property Inspections (On-Going Delinquency Inspection)*

Vacant Property Inspections are performed after the initial inspection and physical possession by the mortgagee have occurred. The mortgagee shall inspect a vacant or abandoned property every 25-35 days following an initial inspection, or more frequently, as authorized by HUD.

Generally, not more than 13 inspections per calendar year may be claimed. Where there is a property in an area requiring more frequent inspections due to high vandalism or local ordinances, police reports and/or a letter from a local law enforcement agency requesting additional protective measures may be submitted to support the additional inspection(s).

B.  **Securing:**

Properties must be secured to prevent unauthorized entry and protect against weather-related damage. All exterior doors shall be secured. The mortgagee is also responsible for the following securing activities:

- Replacing a broken window-pane (re-glazing), unless the opening is to be boarded;
- Securing in-ground swimming pools;
- Securing above-ground pools;
- Securing hot-tubs and spas; and
- Maintaining pools, hot tubs and spas.

### **Minimum Securing Requirements**

1. All windows and doors must be secured.
2. Broken glass shall be removed from interior and exterior areas and replaced, unless the opening is to be boarded.
3. Locks on the front and rear entry doors shall be rekeyed to random identical key codes.
4. If there is a deadbolt lock on the main entry door replace the handle set. Key the deadbolt the same as the handle set.
5. Other entryways that provide immediate access to a living area, attached garage or basement shall be secured with a knob-lock, keyed the same as the front and rear entry doors. Or, if the secondary entryway has an existing deadbolt lock, re-key the deadbolt to the specifications of the front and rear entry doors.
6. Document key-codes to the existing or replacement lock in the Mortgagee's Comments section of form HUD-27011 Part A, which must be provided to the MCM.

7.  Doors and windows must not be braced or nailed shut or the mortgagee will be held accountable for resulting damage. Replace locking mechanism on windows or doors, if inoperable or missing.
8.  Sliding glass doors should be double locked.
9.  Detached or attached garage doors and outbuildings shall be secured with a padlock and hasp if no other locking mechanism exists.
10. Unplug automatic garage door openers, when applicable. Garage doors should be left in such a condition as to allow for opening and closing without the use of the automatic garage door opener. Leave the remote key(s)/transmitter(s) in a kitchen counter drawer.
11. Display 24-hour emergency contact information including a toll free telephone number in a front window. This contact information shall clearly advise any person of interest, or someone who wants access to the property whom to contact.

C.  **Roof Repair:**

The mortgagee is responsible for roof repairs (e.g., patching or replacing loose shingles). The maximum allowance for roof repairs is $600. Please refer to Exhibit A, Item I, "Maximum Property Preservation Allowance and Over-Allowable Expense Request" when the cost of roof repair exceeds $600.

D.  **Pools, Hot Tubs and Spas:**

In-ground pools (including hot tubs or spas that share the same filtering system as the pool) must be secured but not drained. Pools (including hot tubs or spas that share the same filtering system), must be secured with a cover that prevents entry, either deliberate or accidental. Fences must be secured to restrict access, if applicable.

Above Ground Pools: If the above ground pool is in good condition (i.e., built-up with decking or other infrastructure that provides value and will support a pool cover), secure it with a cover that prevents entry, either deliberate or accidental. Above ground pools in poor condition or those that cannot be secured shall be removed. When an above ground pool is removed, remediate any depression in the ground that might constitute a hazard.

Securing Hot Tubs or Spas: The Mortgagee shall drain and secure portable hot tubs and spas. If a hot tub or spa is outdoors, the mortgagee shall secure it with a cover that prevents entry, either deliberate or accidental.

Maintenance of Pools, Hot Tubs or Spas: The Mortgagee must perform monthly maintenance and chemical treatments to operational pools, hot tubs or spas when attached to a pool filtering system.

E.  **Boarding:**

Reimbursement for boarding is provided on a "per opening" basis, up to the maximum allowance per property. The Mortgagee shall be reimbursed for boarding when the following conditions are met:

- The property has been secured for safety reasons; and

- The property is in a high vandalism area and boarding is the only reasonable means to protect the property.

The following specifications shall be followed:

> <u>Windows:</u>  Secured with ½" plywood or equivalent
> <u>Doors:</u>  Secured with 5/8" plywood or equivalent
> <u>Other Openings:</u>  French doors and sliding door openings should be secured with ¾" plywood or equivalent.

All openings shall be boarded.  If security bars are located on windows/doors, boarding is not required.  Small openings, such as pet openings in doors, should be secured but not boarded.

Eliminate any health and safety hazard caused by any protruding bolts used to secure boarding and/or any broken glass.

If local codes differ from HUD requirements above, contact the MCM for direction.

**F.**  **<u>Yard Maintenance and Snow Removal:</u>**

Grass cuts (initial and subsequent cuts) include mowing, weeding, edge trimming, sweeping of all paved areas, and removal of all lawn clippings, related cuttings, and incidental debris (newspapers, flyers, bottles, etc.) removal.  The disposal of all clippings and incidental debris should comply with jurisdictional requirements.
Mortgagees should not order yard maintenance if a homeowners' association for such property covers this service.

<u>Frequency of Grass Cuts:</u>

An initial grass cut is permitted at the beginning of each grass-growing season.  Initial grass cuts may be completed when needed, during any month of the year, in the following states/territories: Alabama, Arizona, California, Florida, Georgia, Guam, Hawaii, Louisiana, Mississippi, Nevada, New Mexico, Puerto Rico, South Carolina, Virgin Islands and Texas.

Initial grass cuts are allowed from June 1 to September 30 in the state of Alaska.  In all other states, initial grass cuts are allowed between April 1 and October 31.  If conveyance occurs during the growing season, a final grass cut should be completed within two weeks of conveyance.  After the initial cut, grass should typically be re-cut twice a month during the periods listed above.  Shrubs are to be trimmed and cuttings removed once in a growing season, between April 1 and October 31.

Grass should be cut to a maximum of two inches in length.  Grass and weeds are to be cut to the edge of the property line, trimmed around foundations, bushes, trees, and planting beds.  Grass and weeds should also be trimmed flush with fences and other construction that would normally require trimming.

### Snow Removal:

The mortgagee shall maintain a safe and accessible property throughout the winter season. Snow shall be removed from the entire entryway, walkways, porch and driveway following a minimum three-inch (3") accumulation. Mortgagees must comply with local codes and ordinances governing the removal of snow and ice.

## G.  **Winterization Requirements:**

Properties are to be winterized between October 1 and March 31, unless, climatic conditions require earlier and extended winterization treatment periods. Properties should only be winterized once. However, a property should be re-winterized if the initial winterization is no longer effective. The winterization process must include cleaning toilets and a complete draining of all plumbing and heating systems. The mortgagee is responsible for any damage to plumbing and heating systems, including sump pumps and wells, caused by untimely, inadequate, or improper maintenance or winterization.

### Utilities:

Utilities are to be turned off unless required to protect the property, such as in states where heat is to remain on. For units that are attached to other units or dwellings, water services and utilities should remain on only if those systems are shared with other units. In some cases, it may be cost-effective to maintain utility service rather than disconnect the service. For example, in some rural areas, large fees may be charged to re-connect water service. Mortgagees should use proper judgment to determine the most cost-effective method of managing utilities when re-connection fees exist.

### Condominiums and Attached Dwellings

At condominiums and attached dwellings in Planned Unit Developments (PUDs), water services and utilities should remain on if the systems are shared with other units.

### Sump Pumps

Where there is an existing sump pump, the mortgagee shall check to make sure the sump pump is operating. The mortgagee shall leave the electricity on, regardless of whether the property is located in a state where utilities are required to be off.

### Utility Accounts

Utility accounts including electricity, gas, home heating oil and water, should be in the mortgagee's name until conveyance of the property to HUD.

In states where utilities should remain on, if there is any reason to believe that a mortgagor may abandon a property, the mortgagee shall contact the utility company to request that the mortgagee be notified of non-payment of utilities so that utilities can be transferred to the mortgagee's name and the heat remain on if the mortgagor vacates.

### Propane and Oil Systems

If the property has a propane or oil heating system, put a "KEEP FULL" work order on with a local supplier in those jurisdictions, where the heat should remain "ON."

### Water:

### Domestic Water

If the water supply source is a public system, the utility company shall be contacted to turn off the water supply at the curb. The mortgagee shall not cut water lines or remove water meters. The water department or provider shall be notified when water is turned off so that a final meter reading is completed.

### Wells

If the water supply is a private well, the mortgagee shall turn off the well at the breaker panel and tape off the breaker, disconnect the water supply line between the property and pressure tank and install a hose bib on the pressure tank side of the breaker. The hose bib shall be tagged "For Water Testing". All pressure tanks shall be drained. If pump is surface mounted, drain pump housing. If submersible, then disconnect the check valve and drain all pump, suction, and discharge pipes. All fixtures shall be winterized.

**H.    Demolition:**

The cost of demolition is not included in the maximum cost limit per property. In such cases, where a local jurisdiction has determined a property to be uninhabitable and mandates demolition of a property, the mortgagee must obtain approval from the MCM. Requests received less than five (5) business days of the conveyance timeframe where no extension has been requested and approved, will be rejected, unless notification by the local jurisdiction has not been received within that period.

The mortgagee must provide to the MCM documentation to include the notice of demolition by the local jurisdiction along with inspection reports and photographic documentation that establishes the condition of the property when the mortgagee first entered or took possession of the property.

**7.    Claim Submission and Documentation**

HUD will reimburse mortgagees for P&P actions in accordance with the provisions of this Mortgagee Letter, upon receipt of Form HUD-27011 Parts A & B. For instructions on claim processing and document submission, see HUD Handbook 4330.4, REV-1, "FHA Single Family Insurance Claims" (http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4330.4/index.cfm).

Documentation including photographs to support each P &P claimed expense shall be provided to the MCM through the web-based P260 portal, upon submission of the claim for insurance benefits request. The documentation must support the expenditures and provide a verifiable timeline that

demonstrates the mortgagee took prudent actions to preserve and protect the property until its conveyance. The MCM will audit <u>all</u> claims filed under HUD Form 27011 parts B-D to evaluate the charges against Exhibit B of this Mortgagee Letter and ensure that the Department was not overcharged. The MCM will evaluate the cost of the preservation and protection work performed using an industry standard cost estimator.

HUD will require the repayment of reimbursements if it determines that:

- Amounts paid for reimbursement were unnecessary or excessive; or
- Services claimed were not performed or not performed properly

  To claim reimbursement, all P&P actions shall meet the guidelines as provided in 24 CFR § 203.377 through 24 CFR § 203.381, the guidance provided in this Mortgagee Letter and any subsequent guidance as directed by HUD.

  Mortgagees are prohibited from performing or claiming P&P services after the deed has been recorded. However, payment of certain utility bills may be considered an exception to this guideline. Reimbursable costs are outlined on the attached Exhibit B, "Maximum Property Preservation Allowance" chart.

## 8.    Requests to Exceed Timeframes

The mortgagee shall submit a separate request for each extension of time to the MCM. All requests for extensions shall be submitted on form HUD-50012, *Mortgagee's Request for an Extension of Time (now PDF fill-able)* through HUD's web-based P260 portal. Upon receipt, the MCM will have five (5) business days to approve the request, reject the request as lacking adequate documentation or deny the request.

If the MCM rejects or denies the request for an extension of time, the MCM will specify, in writing, the reason for the rejection or denial on form HUD-50012 and post this information in HUD's P260 portal. Verbal requests for extensions will not be accepted. Requests received less than five (5) business days of the conveyance timeframe will be rejected. For guidance on extension of time requirements, see HUD Handbook 4330.4, "FHA Single Family Insurance Claims," Section 1-6, Extension of Time Requirements.

## 9.    Appeal of a Demand for Reimbursement

If a mortgagee has improperly conveyed a property or billed HUD for P&P services that were either not performed or were not performed properly, or in cases of mortgagee neglect, HUD will authorize its MCM to issue a Demand Letter in accordance with 24 CFR § 203.363.

If a mortgagee believes that the demand decision is not supported by regulation or circumstance, the mortgagee may request a review of the indebtedness determination or inspect departmental records related to the debt by submitting a request to the MCM through HUD's P260 portal within 20 days of receipt of the Secretary's notification (24 CFR § 17.104-105).

10. **Record Retention**

Mortgagees are reminded that pursuant to HUD Handbook 4330.4, paragraph 1-12, all claim files must be maintained for a period of three years after the date of the last check received by the mortgagee in payment of a claim. The submission of documents to P260 does not abrogate this requirement.

11. **Enforcement**

As a cautionary note, the Department reminds mortgagees that in addition to the surcharges discussed in this Mortgagee Letter, HUD may pursue enforcement action, including debarment, civil money penalties and actions under the Program Fraud Civil Remedies Act.

**EXHIBIT B:      Maximum Property Preservation Allowances**

| DESCRIPTION OF SERVICE | MAXIMUM ALLOWANCE |
|---|---|
| Property Inspections | |
|    Property Inspections | $30 per unit; $15 additional unit |
|    Subsequent inspection (as reqd.) | $20 per unit; $15 additional unit |
|    Permit & Vacant property registration | $250 |
| Securing | |
|    Initial securing of property | $60 per lock-set & $40 per pad lock; |
|    Re-glazing window (replacing a window pane) | $30 |
|    Re-securing/re-keying of property | $0 |
|    Roof repair | $600    (FHA does not tarp ) |
|    Securing in-ground swimming pools | $1,050 |
|    Securing above-ground swimming pools | $400 |
|    Securing hot-tubs & spas | $50 |
|    Maintenance of pools, spas & hot tubs | $100 monthly |
| Boarding | |
|    Windows with 1/2" plywood or equivalent | $80 per window; $550 max for all windows |
|    Doors with 5/8" plywood or equivalent | $150 per opening; $300 |
|    Other openings with 3/4" plywood or equivalent | $125 per opening maximum |
| Debris/Trash Removal/Dumping fees | |
|    Amount per cubic yard of trash | $50 |
|    Maximum allowable for 1 unit | $600 (Minimum load of 12 cu. yds of waste) |
|    Maximum allowable for 2 units | $750 (Minimum load of 15 cu yds of waste) |
|    Maximum allowable for 3 units | $900 (Minimum load of 18 cu yds of waste) |
|    Maximum allowable for 4 units | $1,050 (Minimum load of 21 cu yds of waste) |
|    Vehicle removal | $210 per vehicle |
| Yard Maintenance | |
|    Initial cut up to 5,000 sf. | $50 |
|    Initial cut 5,001 - 10,000 sf. | $75 |
|    Initial cut 10,000 -15,000 sf. | $100 |
|    Re-cut up to 5,000 sf. | $40 |
|    Re-cut 5,001 - 10,000 sf. | $65 |
|    Re-cut 10,000 - 15,000 sf. | $85 |
|    Shrub Trimming | $30 per site |
| Hazard abatement | |
|    Snow/ice removal | $50 |
|    Sump Pump repair | $50 |
|    Sump Pump installation | $300 |
|    Water Heater/Well/ Septic/ HVAC repair | $300 |
|    Pumping water from basement | $1,000 |
|    Demolition  (excluded from the max allowable per property) | Up to $10,000 (single story) Up to $12,500 (multi-story) |
| Winterization | |
|    Dry Heat - 1 unit | $100 |
|    Dry Heat - additional unit | $50 |
| MAXIMUM PROPERTY PRESERVATION ALLOWANCES | |

| DESCRIPTION OF SERVICE | MAXIMUM ALLOWANCE |
|---|---|
| Wet (steam) Heat - 1 unit | $150 |
| Wet (steam) Heat – additional unit | $90 |
| Wet (radiant) Heat - 1 unit | $250 |
| Wet (radiant) Heat - additional unit | $125 |
| Reduced Pressure Zone (RPZ) valves | $150 (if State or locally req'd.) |
| Pools, Spas, and Hot-tubs | $200 (if State or locally req'd.) |
| Utilities | |
| Electricity, Gas, Oil, Propane, Water & Sewer | $75 (For one-time shut off/transfer fee.) |
| Maximum Allowance Per Property | $2,500 |

16

# EXHIBIT C

<pre>
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3    DANIEL DEEGAN, et al.,         )  No. 13 C 4840
                                     )
 4                    Plaintiffs,    )  Chicago, Illinois
                                     )  September 13, 2013
 5                                   )  8:45 o'clock a.m.
      -vs-                           )
 6                                   )
      SAFEGUARD PROPERTIES, LLC,     )
 7                                   )
                      Defendants.    )
 8

 9           TRANSCRIPT OF PROCEEDINGS - MOTION
           BEFORE THE HONORABLE MILTON I. SHADUR
10
      APPEARANCES:
11
      For the Plaintiffs:     MR. MARK A. BULGARELLI
12                            PROGRESSIVE LAW GROUP LLC
                              One North LaSalle Street
13                            Suite 2255
                              Chicago, Illinois 60602
14

15    For the Defendant:      MR. SHOMSHON MOSKOWITZ
                              TRIBLER ORPETT & MEYER P.C.
16                            225 West Washington Avenue
                              Suite 1300
17                            Chicago, Illinois 60606

18

19

20

21

22

23    Court Reporter:         ROSEMARY SCARPELLI
                              219 South Dearborn Street
24                            Room 2304A
                              Chicago, Illinois  60604
25                            (312) 435-5815
</pre>

1          THE CLERK:  13 C 4840, Deegan versus Safeguard

2     Properties.

3          MR. MOSKOWITZ:  Good morning, your Honor, Shomshon

4     Moskowitz on behalf of Safeguard Properties.

5          MR. BULGARELLI:  Good morning, your Honor, Mark

6     Bulgarelli on behalf of plaintiff.

7          THE COURT:  Good morning.

8          MR. MOSKOWITZ:  Good morning.

9          THE COURT:  Why don't you both sit down because I

10    want to comment on the stuff that I have gotten and then hear

11    from you.  Okay?

12         MR. MOSKOWITZ:  Okay.

13         MR. BULGARELLI:  Thank you.

14         THE COURT:  You can sit up close here.  You don't

15    have to go all the way back there.

16         The first thing I want to say, I know that I am --

17    I have -- or at least I have expressed -- maybe I don't have

18    more concern about this than my colleagues -- but, you know,

19    we are taught regularly by the Court of Appeals and quite

20    properly that we district judges do not make precedents.  You

21    know, what we say is ours; and to the extent that our

22    colleagues do or do not disagree or agree, that is a function

23    of what their views are, not of a colleague, but of the

24    reasoning of what is involved.  So it is -- to me it is,

25    frankly, very annoying to get a paper that says throughout

1    "this District Court" or "this Court has held," when it is an

2    opinion of Ginny Kendall or Gary Feinerman and not mine.

3         If you have read any of my opinions, you know that

4    because I am allergic to using the first person singular in

5    an opinion, I somehow have a feeling that that is -- I don't

6    know what to characterize it, but I have not.  And so I

7    always say "this Court," which is a euphemism.  And of course

8    it gets awkward when I was talking about when I was in

9    practice and I say "when this Court was in practice."

10         But I get these references to Judge Kendall's

11   opinion, Judge Feinerman's opinion.  And the question is, do

12   I find them persuasive?  Well, short answer is I do.  There

13   is no predicate here, no proper predicate, for holding

14   Safeguard Properties as a debt collector.  It is just not

15   there.  The thing that they do, although maybe it could

16   create pressure toward the payment of a debt, which is not

17   their direct activity or direct purpose, but if so -- even if

18   so, it would be purely incidental to what their real

19   activities are.  And accordingly what that means is that

20   certainly Count Two is -- has to be dismissed.  It just

21   doesn't state a viable claim.

22         Now, what that then triggers, although nobody

23   talked about it, is that we don't have subject matter

24   jurisdiction here.  Why?  Because what are named here, in

25   addition to Safeguard Properties, are a number of Doe

1    defendants.  And the -- and history tells us -- I think the

2    first opinion I wrote about this was probably 1985 in a case

3    called John Hancock in which it was an action in which there

4    were unnamed real defendants, but unnamed, and therefore they

5    were referred to as Does.  And of course we don't know the

6    citizenship of a Doe defendant.

7          And, moreover, the strong likelihood is that even

8    though Safeguard Properties may be a foreign corporation, the

9    Doe defendants who actually do the groundwork here in

10   Illinois are most likely Illinois citizens.

11         So the net result is that this lawsuit goes away

12   because there is no -- with the federal question claim having

13   been dismissed, as it must be, the other two claims which are

14   under Illinois law and therefore have to rely on diversity of

15   citizenship fail for lack of subject matter jurisdiction.

16         So bottom line is, one, I grant the motion to

17   dismiss Count Two and, two, I dismiss the action for lack of

18   subject matter jurisdiction.  And that of course moots the

19   other motion which is to strike the class allegations because

20   you have got to have jurisdiction before you can go on to see

21   whether Deegan is able to represent the class and whether a

22   class is appropriate.

23         So although it is nice to see both of you, this is

24   the last time.  So you tell me what the problem is with that.

25         MR. BULGARELLI:  Your Honor, first of all, we of

1    course -- these motions were just filed several days ago --

2         THE COURT:  I know that.

3         MR. BULGARELLI:  -- have not had any chance to

4    brief them or set a briefing schedule.

5         THE COURT:  I know, but I have.

6         MR. BULGARELLI:  With all due respect, your Honor,

7    regarding the cases that they cite, there is equally

8    persuasive by your colleagues here in this Court that says

9    the complete opposite.  In particular I point to the Boyd

10   decision.  I personally have another decision entered by

11   Judge St. Eve in the case of Frazier.  These -- the

12   activities of Safeguard have been deemed in numerous court

13   actions to be held to be the activities of a debt collector

14   because the FDCPA does not just hold in regards to people who

15   are actually collecting debt but also people who are

16   enforcing security interests.

17        And what happens here, Safeguard is a property

18   security company that goes in on behalf of the banks for the

19   purpose of enforcing their security interest.

20        THE COURT:  I have -- I have seen those cases, and

21   I have thought about those as well.  But again I -- and I

22   recognize -- and I tried to indicate that it may be that the

23   activities that they engage in may facilitate debt collection

24   because -- for example, because it creates pressure on the

25   debtor to honor the debt in order to avoid the unpleasantness

1    of having Safeguard come in and do its thing.  But you see

2    once again the fact remains that their principal activity is

3    not that of debt collection.  Their principal activity is a

4    different kind of function.  They do not act -- collect the

5    debts of another in that meaningful sense.

6            So I recognize and I respect your point, but you

7    see that is -- that is the reason that I started out by

8    talking about the fact that I find fault with their saying

9    what this Court has done because that is not true.  What has

10    happened is that this issue has been dealt with in a number

11    of opinions.  I am familiar with them.  And I recognize the

12    point.

13            But it happens I agree particularly with I thought

14    the very thoughtful opinion by Gary Feinerman.  But that is

15    my view as well, that we are really not talking about

16    somebody who is a debt collector in the meaningful sense that

17    the statute deals with.

18            MR. BULGARELLI:  And, your Honor, I -- I obviously

19    understand the -- what you are stating there.  But what the

20    statute -- I think there is a distinction.  There is a matter

21    of their principal purpose is to collect debts.  That

22    triggers the FDCPA.  But it has also been ruled specifically

23    completely separate.  They don't have to do any business of

24    actually collecting the debt --

25            THE COURT:  I know that.

1          MR. BULGARELLI:  -- to be triggered under the --

2          THE COURT:  But that is what I -- that is what I

3    have just covered, that is, you are quite right that they

4    don't have to be in there sticking their hand out and saying,

5    "Pay."  That is not the point.  The point is, what is their

6    principal activity?  Their principal activity, although it

7    may have that as a collateral -- even a collateral impact or

8    a collateral purpose, which is some question, but I will

9    grant that for the moment, the fact remains it is not their

10   principal purpose.  It is not their -- anybody who looks at

11   the thing and is thinking about the English language in its

12   ordinary meaning would not characterize Safeguard Properties

13   as a debt collector.

14         MR. BULGARELLI:  And, your Honor, I believe though

15   -- and pardon me because I don't have the standard here and

16   it may be direct in plaintiff's pleading, but the FDCPA

17   standard says that the principal purpose is the collection of

18   debt but does not require the principal purpose requirement

19   for the enforcing of the security interest.  And that is the

20   fine distinction in regards to this.

21         THE COURT:  I am sorry, that doesn't fly.  You

22   know, I have dealt, regrettably, because we get such a

23   proliferation of these -- I have had the -- I can't tell you

24   how many cases I have had that involve the Federal Debt

25   Collection statute, many of them in -- most of them in

1  different contexts from this one.  Most of them are -- come

2  to the issue of things that may be closer to the line.  And I

3  recognize that there is no -- there is no totally bright line

4  distinction.

5         But the point is that if you think about the real

6  world aspect of this, this thing clearly falls on the other

7  side of whatever line there is, even though the particular

8  line may be amorphus, not in this situation.  I just don't

9  find it persuasive to characterize Safeguard Properties which

10  is engaged in a different kind of enforcement.  And as I

11  started out by telling you, I recognize that people, in order

12  to avoid the kind of unpleasantness that is involved in let's

13  say invasion of property and shutting things down and so on,

14  are then much more likely to try to get their debts paid.  I

15  understand that.

16         But that is not the test.  It is really not the

17  test.  Because if that were the case, then almost anybody who

18  is somehow collaterally involved in the process but really

19  doesn't do anything about collecting the debt would be

20  subject to a statute that was not drafted to cover them.  And

21  that is the problem that I see existing here.

22         So that is my -- that is my take on it.  And as I

23  say, I understand and I respect the opinions of some of my

24  colleagues who in whatever situations are presented before

25  them may come to a different view, but I don't.

1          So that is my -- that is my answer.  I grant the

2    motion to dismiss Count Two.  I then dismiss the action

3    itself for lack of subject matter jurisdiction because the --

4    of the absence of diversity.  And the other motion that was

5    tendered, which is the motion to strike class allegations, is

6    obviously denied simply on mootness grounds.

7          MR. BULGARELLI:  And, your Honor, with all due

8    respect I would ask that we at least have an opportunity to

9    brief this matter before you make those rulings, as I do

10   these cases often, and to be blunt this is -- would be the

11   first time I have had an issue with somebody deeming that

12   they do not qualify under the FDCPA.  And so --

13         THE COURT:  That is the first time you have had it?

14         MR. BULGARELLI:  Well, we argue it, but --

15         THE COURT:  The others --

16         MR. BULGARELLI:  I haven't lost it.  I haven't lost

17   it.

18         THE COURT:  Others have had it.

19         MR. BULGARELLI:  And there are specifics.  Some of

20   the cases pointed out only deal with certain aspects of

21   certain provisions of certain law, not the unfair aspect of

22   it.  I would just ask that we have an opportunity to show you

23   the authority.

24         THE COURT:  I don't know how to be more plain.  You

25   may not have had a chance to look, but I have.  And I have it

1    against a backdrop of having dealt with the issue.  So, you

2    know, for a lawyer to file a memorandum that cites cases and

3    causes me to read cases that that lawyer has done when I have

4    actually dealt with it to begin with doesn't advance the

5    ball.  It really does not add to the corpus juris.  And --

6    well, I have said my say.

7           Okay.  Thank you.

8           MR. BULGARELLI:  Thank you, your Honor.

9           MR. MOSKOWITZ:  Thank you, your Honor.

10       (Which were all the proceedings heard.)

11                 CERTIFICATE

12     I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    s/Rosemary Scarpelli/       Date:  November 7. 2013

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SCOTT C. SEEHAWER, et al.,     )
                             )
      Plaintiffs,        )
                             )    No. 13 CV 5715
      v.             )
                             )    Hon. Charles R. Norgle
BAC HOME LOANS SERVICING, L.P., et al.,  )
                             )
      Defendants.     )

## ORDER

Defendants J.D. Wicks Co., Safeguard, LLC, Here to Serve d/b/a Midwest Metro's Federal Rule of Civil Procedure 12(b)(6) Motions to Dismiss Count IV of the Plaintiffs' Complaint [34] [43] [48] are granted. Defendants J.D. Wicks Co., Safeguard, LLC, Here to Serve d/b/a Midwest Metro's Federal Rule of Civil Procedure 12(f)(2) Motions to Strike Paragraphs 82, 97, and 105 of the Plaintiffs' Complaint [38] [45] [50] are granted.

## STATEMENT

Before the Court are Defendants J.D. Wicks Co. ("Wicks"), Safeguard, LLC ("Safeguard"), and Here to Serve d/b/a Midwest Metro's ("Here to Serve") (collectively, "Defendants") motions to dismiss Count IV of Plaintiffs Scott C. Seehawer ("Scott"), Nancy J. Seehawer ("Nancy"), and Mackenzie Jones's ("Jones") (collectively, "Plaintiffs") complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Also before the Court are Defendants' motions to strike paragraphs 82, 97, and 105 of Plaintiffs' complaint pursuant to Rule 12(f)(2). For the following reasons, Defendants' motions are granted.

Scott and Nancy entered into a mortgage on their home (the "subject property") for $263,920.00 with Countrywide Home Loans on November 30, 2004. Subsequently, Defendant BAC Home Loans Servicing, L.P. ("BAC") acquired ownership and servicing rights of the mortgage. Scott and Nancy lived at the subject property with Nancy's daughter, Jones, until 2010 when they moved out and into a new residence. Jones returned to live at the subject property with her daughter in July of 2011. Meanwhile, BAC filed a complaint to foreclose Scott and Nancy's mortgage on the subject property in Kendall County, Illinois on October 15, 2009. To date, the state court foreclosure suit remains pending.

Plaintiffs allege that in January of 2013, BAC issued a work order to its home preservation services company, Safeguard, to change the locks and winterize the subject property. Safeguard then hired subcontractor Here to Serve, who in turn hired its subcontractor, Wicks, to perform the requested work on the subject property. According to Plaintiffs, on January 11, 2013, employees of Wicks "forcibly entered the subject property, changed the locks, damaged the real estate and other personal property therein, and stole personal items from the subject property." Compl. ¶ 26.

Defendants now move to dismiss Count IV of Plaintiffs' complaint, arguing that it fails to state a claim for intentional infliction of emotional distress ("IIED") under Illinois law as to all Plaintiffs. Under Federal Rule of Civil Procedure 8, a complaint must contain a "short plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and "simple, concise, and direct" allegations, id. at 8(d)(1). Rule 8 does not require "'detailed factual allegations,'" but it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). This short and plain statement must provide the defendants with fair notice of the claim and the grounds for relief. Twombly, 550 U.S. at 555 (citation omitted). "[A] plaintiff's claim need not be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 935 (7th Cir. 2012) (quoting Twombly, 550 U.S. at 556).

"Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress only if she establishes that: (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." Naeem v. McKesson Drug Co., 444 F.3d 593, 604-605 (7th Cir. 2006) (internal quotation marks and citation omitted). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" Swearnigen-El v. Cook Cnty. Sheriff's Dep't, 602 F.3d 852, 864 (7th Cir. 2010) (citing Kolegas v. Heftel Broad. Corp., 607 N.E.2d 201, 211 (Ill. 1992)).

Plaintiffs allege that on January 11, 2013, while employees of Wicks were working at the subject property, Jones arrived with her daughter and saw a sign on the window that indicated that the property was secured and that unauthorized access was prohibited. Jones also noticed a black lock box on the front door. Jones allegedly entered through an unlocked window to recover her belongings. She noticed, inter alia, that personal items were missing or out of place, and that her "underwear had been sorted through, causing her to feel violated, powerless, and helpless." Compl. ¶ 35. After gathering some belongings, Jones left the subject property with her daughter, and returned alone approximately one hour later.

When she returned, Jones saw a truck at the front of the property, and she entered and found two unknown men in the house, whom she believes were employees of Wicks. The men asked Jones whether she was the owner, and she informed them that she was the lawful tenant. The men then told Jones that she was no longer permitted on the subject property because the bank had taken over the house, and that they were sent to winterize the property. Nevertheless, the men allowed Jones to collect "a box of keepsakes" from the house before leaving. Id. ¶ 45. Plaintiffs allege that the men twice offered to help Jones carry her boxes because they noticed that she was a small or petite woman. Jones alleges that these comments were made in a joking manner and that it made her feel embarrassed because "it was clear that the man was the person who had rifled through her underwear earlier in the day and was making an 'inside' joke to the other man." Id. ¶ 47.

Plaintiffs argue that "[t]he Defendants' violation of Plaintiffs' rights, entry into Plaintiffs' property, and the removal and ransacking of [Jones's] belongings was extreme and outrageous conduct." Comp. ¶ 86. Specifically, with respect to Jones, the Court finds that the alleged ransacking of her intimate apparel before she arrived, and her subjective interpretation of the

2

Wicks employees' offer to help with her boxes does not rise to the level of extreme or outrageous conduct. It is well established that "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not constitute extreme or outrageous conduct. Honaker v. Smith, 256 F.3d 477, 490 (7th Cir. 2001) (internal quotation marks and citation omitted). As to Scott and Nancy, they were not present or living at the subject property when the events took place; their personal belongings were not affected; and there is no indication that Defendants or their employees were aware that Scott and Nancy owned the subject property. There was simply nothing objectively outrageous about Defendants' alleged conduct. See Jackson v. Bank of N.Y., No. 11-CV-6410, 2012 WL 2503956, at *4 (N.D. Ill. June 28, 2012) (finding that the plaintiff failed to state a claim for IIED where the defendant allegedly "performed winterization and property preservation services too early" while the plaintiff was out of town). Accordingly, Defendants' motions to dismiss Count IV are granted because Plaintiffs fail to sufficiently allege plausible claims for IIED.

Next, Defendants move to strike paragraphs 82, 97, and 105 of Plaintiffs' complaint. Pursuant to Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The three paragraphs at issue are largely the same, alleging that "Defendants' conduct constitutes willful and wanton disregard for the rights of the Plaintiffs." Compl. ¶¶ 82, 97, 105. These paragraphs do not purport to allege separate claims for willful and wanton conduct, but rather they come at the end of Plaintiffs' claims for intrusion upon seclusion (Count II), intentional infliction of emotional distress (Count IV), and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq. (Count V). Plaintiffs argue that the words are merely adjectives and not meant as legal terms of art. Under Illinois law, however, "a plaintiff pleading willful and wanton misconduct must establish the same basic elements of a negligence claim, which are the existence of a duty, breach of that duty, and an injury proximately resulting from the breach." Doe-2 v. McLean Cnty Unit Dist. No. 5 Bd. of Dirs., 593 F.3d 507, 514 (7th Cir. 2010) (citing Krywin v. Chi. Transit Auth., 909 N.E.2d 887, 890 (Ill. App. Ct. 2009)). Because Plaintiffs fail to sufficiently allege a plausible claim for willful and wanton misconduct, paragraphs 82, 97, and 105 are stricken.

For the foregoing reasons, Defendants' motions to dismiss are granted. Accordingly, Count IV is dismissed as to all Plaintiffs. In addition, Defendants' motions to strike paragraphs 82, 97, and 105 are granted.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: December 30, 2013

3